# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MINNESOTA

In re:

The Diocese of New Ulm,

        Debtor.

Case No.: 17-30601

Chapter 11 Case

## AMENDED DISCLOSURE STATEMENT IN SUPPORT OF
## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

THE DIOCESE OF NEW ULM (THE "DIOCESE") AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "UCC" AND, TOGETHER WITH THE DIOCESE, THE "PLAN PROPONENTS") SEEK CONFIRMATION OF THEIR FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION (THE "PLAN").

THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT"), THE PLAN, THE ACCOMPANYING BALLOTS, AND THE RELATED MATERIALS ARE BEING FURNISHED BY THE PLAN PROPONENTS, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION BY THE PLAN PROPONENTS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE ARTICLE XIII OF THE PLAN. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DIOCESE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT INCLUDING UNDER "RISK FACTORS TO BE CONSIDERED" IN SECTION X.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DIOCESE (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF ANY SECURITIES THAT MAY BE DEEMED TO HAVE BEEN ISSUED PURSUANT TO

i

THE PLAN OR THIS DISCLOSURE STATEMENT OR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE WHERE THE ORDER OR SALE IS NOT PERMITTED.

TO THE EXTENT ANY TREATMENT UNDER THE PLAN IS DEEMED TO CONSTITUTE THE ISSUANCE OF A SECURITY, NONE OF THE SECURITIES WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND THE SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS OR SECTION 1145 OF THE BANKRUPTCY CODE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DIOCESE FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEF. THE PLAN PROPONENTS' PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE PLAN PROPONENTS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DIOCESE, THE DIOCESE BUSINESS OPERATIONS, THE VALUE OF THE DIOCESE'S ASSETS, OR THE VALUES OF ANY INTERESTS DESCRIBED TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS

MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DIOCESE OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DIOCESE OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE DIOCESE AND A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF CLASS 1 AND CLASS 2 CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATION OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

TO OBTAIN, AT YOUR COST, ADDITIONAL COPIES OF THIS DISCLOSURE STATEMENT PLEASE CONTACT THE DIOCESE'S COUNSEL AT:

Fredrikson & Byron P.A.
Attn: Shataia Stallings
200 South Sixth Street, Suite 4000;
Minneapolis, MN 55401,
612-492-7730
sstallings@fredlaw.com;

OR THE UCC'S COUNSEL AT:

Stinson LLP
Attn: Aong Moua
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
612-335-1792
aong.moua@stinson.com.

# TABLE OF CONTENTS

I.  INTRODUCTION. ...................................................................................................... 1
    A.  Summary of the Plan. ........................................................................................ 1
    B.  Voting Procedures. ............................................................................................ 1
        1.  Ballots. ................................................................................................... 1
        2.  Importance of Your Vote. ...................................................................... 2
    C.  Brief Explanation of Chapter 11. ...................................................................... 2

II.  DESCRIPTION OF THE DIOCESE. .......................................................................... 3
    A.  Nature and History of the Diocese. .................................................................... 3
    B.  Events Leading to the Chapter 11 Case. ............................................................ 5

III.  EVENTS DURING THE CHAPTER 11 CASE. .......................................................... 5
    A.  Bankruptcy Filing and First Day Orders. .......................................................... 5
    B.  Schedules and Statements. ................................................................................. 6
    C.  Retention and Employment of the Diocese's Professionals. .............................. 6
    D.  Appointment of Official Committee of Unsecured Creditors. ........................... 6
    E.  Transfer of Endowment Funds to Investment Accounts. .................................... 6
    F.  Exclusivity Extensions. ..................................................................................... 7
    G.  Asset Sales. ........................................................................................................ 7
        1.  Sale of Single-Family Home Lots. ........................................................ 7
        2.  Sale of Hillesheim Farm Property. ........................................................ 7
        3.  Sale of Schneider Farm Property. .......................................................... 7
    H.  Insurance Coverage Adversary Proceeding. ...................................................... 8
    I.  Meadowbrook Property Interest. ....................................................................... 8
    J.  Settlement Negotiations and Mediations. .......................................................... 8

IV.  SUMMARY OF THE PLAN. ...................................................................................... 9
    A.  Overview of Classification and Treatment of Claims and Interests. ................... 9
    B.  Description of Classes and Treatment. ............................................................... 9
        1.  Allowed Administrative Expense Claims. ............................................. 10
        2.  Statutory Fees and Court Costs. ............................................................ 10
        3.  Unsecured Priority Claims. ................................................................... 11
        4.  Class 1: Known Survivor Claims. ......................................................... 11
        5.  Class 2: Unknown Survivor Claims and Late-Filed Survivor
             Claims. ................................................................................................. 12
        6.  Class 3 – General Unsecured Claims. ................................................... 12
        7.  Class 4 – Parish Claims. ....................................................................... 12
    C.  Creation of Trust. ............................................................................................... 12
        1.  Trust Assets. ......................................................................................... 13
        2.  Trust Reserves. ..................................................................................... 13
        3.  Trust Liability. ...................................................................................... 15
    D.  Distributions and Claims Administration. ......................................................... 15
        1.  Survivor Claims. ................................................................................... 15
        2.  Distributions for Claims Other Than Survivor Claims. ......................... 16
    E.  Executory Contracts and Unexpired Leases. ..................................................... 18

F.    Conditions to Effective Date............................................................ 19
G.    Effects of Confirmation. .................................................................. 20
    1.    Discharge. ................................................................................ 20
    2.    Title to and Vesting of Assets.................................................. 20
    3.    Corporate Action...................................................................... 20
    4.    Exculpation and Limitation of Liability. ................................. 20
    5.    Limitation of Liability.............................................................. 21
    6.    Channeling Injunction.............................................................. 21
    7.    Supplemental Settling Insurer Injunction. .............................. 22
    8.    Protected Parties' Waiver and Consent.................................... 23
    9.    Debtor Waiver and Release of Claims...................................... 24
    10.    Injunctions in Full Force and Effect. ...................................... 24
    11.    Injunctions Critical.................................................................. 24
    12.    Indemnity for Channeled Claims. ........................................... 24
    13.    Defense and Indemnity for Covered Non-Survivor Claims. ..... 25
    14.    Effectuating Documents; Further Transactions; Exemption from
Certain Transfer Taxes........................................................... 25
    15.    Cancellation of Instruments. ................................................... 25
    16.    Dissolution of the Committee. ................................................ 26
H.    Child Protection Protocols. .............................................................. 26

V.    POST CONFIRMATION MANAGEMENT OF THE DIOCESE. ................................ 26

VI.    MEANS OF EXECUTION.......................................................................... 26

VII.    TAX CONSEQUENCES OF THE PLAN. ....................................................... 26
A.    Federal Income Tax Consequences to Holders of Unsecured Claims................. 27
B.    Federal Income Tax Consequences to the Diocese............................... 28
C.    Tax Consequences to the Trust. ....................................................... 28

VIII.    ALTERNATIVES TO THE PLAN. .............................................................. 28
A.    Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code. ................... 29
B.    Dismissal of the Diocese's Chapter 11 Case. ..................................... 29
C.    Chapter 7 Liquidation Not A Viable Alternative................................ 29

IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN.......................................... 29
A.    General Confirmation Requirements. ................................................ 29
B.    Best Interests Test. ........................................................................ 30
C.    Financial Feasibility Test. ............................................................... 31
D.    Cramdown Alternative.................................................................... 31

X.    RISK FACTORS TO BE CONSIDERED......................................................... 32
A.    Failure to Satisfy Vote Requirement................................................. 32
B.    Non-Confirmation or Delay of Confirmation of the Plan...................... 32
C.    Non-Consensual Confirmation. ....................................................... 32
D.    Risk of Non-Occurrence of the Effective Date.................................... 33
E.    Classification and Treatment of Claims............................................. 33

     F.      Review of Class 1 And Class 2 Claims. ................................................................ 33

XI.     CONCLUSION. ................................................................................................................. 33

**EXHIBITS**

EXHIBIT A – LIQUIDATION ANALYSIS

EXHIBIT B – CASH FLOW PROJECTIONS

# I.        INTRODUCTION.

On March 3, 2017 (the "Filing Date"), the Diocese filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The case is pending before the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court").

The Plan sets forth, among other things, the proposed treatment of Claims and other interests in accordance with the Bankruptcy Code. This Disclosure Statement is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan. A copy of the Plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control. Capitalized terms used, but not defined, in this Disclosure Statement shall have the same meanings ascribed to them in the Plan.

## A.        Summary of the Plan.

The Plan establishes a Trust funded by (i) assets of the Diocese, (ii) contributions from the Parishes, and (iii) settlement proceeds from settlements with the Settling Insurers. The Trustee will liquidate the Trust Assets and fairly distribute the proceeds to the Survivors pursuant to the allocation protocol contained in the Survivor Claim Distribution Plan.

The Plan further provides that the Diocese's General Unsecured Creditors will be paid in full, that all Claims held by the Survivors will be channeled to the Trust, and that the Diocese will receive a discharge from all remaining Claims, permitting the Diocese to continue its ministry after confirmation of the Plan.

## B.        Voting Procedures.

### 1.        Ballots.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for purposes of voting on the Plan. If you hold claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate ballots that must be used to vote in each separate Class.  If voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class.

Please read the voting instructions on the ballot for a thorough explanation of the voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE DIOCESE'S COUNSEL AT (612) 492-7330 OR THE UCC'S COUNSEL AT (612) 335-1792. THE DIOCESE, UCC, AND COUNSEL FOR BOTH THE DIOCESE AND UCC CANNOT PROVIDE YOU WITH ANY LEGAL ADVICE.**

**FACSIMILE, E-MAIL, OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

A ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one ballot voting the same Claim before the voting deadline, the last ballot received before the voting deadline will supersede all prior ballots. In addition, you may not split your votes for your Claims within a particular Class under the Plan. Therefore, a ballot within a given Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted. You may not change your vote after the voting deadline passes.

To be counted, completed ballots must be mailed to the clerk of the Bankruptcy Court at the following address:

> Office of the Clerk of Court
> Attention: Jennifer
> U.S. Bankruptcy Court District of Minnesota
> 200 Warren E. Burger Federal Building and United States Courthouse
> 316 North Robert Street
> Saint Paul, Minnesota 55101

> 2.   *Importance of Your Vote.*

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that Vote.

Only the ballots of those Creditors who actually vote are counted for purposes of determining whether a class voted to accept the Plan. Your failure to vote will leave to others the decision to accept or reject the Plan.

**C.   Brief Explanation of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon the filing of a petition for reorganization under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a Chapter 11 reorganization is the confirmation of a plan of reorganization or liquidation. The plan sets forth the means for satisfying the claims of creditors and interests of shareholders or members of the debtor. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders, and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under Section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has voted to accept the plan. Votes will be counted only with respect to claims: (1) that are listed on the Diocese's Schedules other than as disputed, contingent, or unliquidated; or (2) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan may seek to "cram down" the plan by confirming it under Section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if another impaired class has voted to accept the plan, the plan does not discriminate unfairly, and the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by sending a written request to the Diocese's counsel.

Section 1129(a) of the Bankruptcy Code establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim or interest must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

If the Plan is confirmed by the Bankruptcy Court, its terms are binding on the Diocese, all Creditors, and other parties in interest, regardless of whether they have voted to accept the Plan.

## II.   DESCRIPTION OF THE DIOCESE.

### A.   Nature and History of the Diocese.

The Diocese was erected by the Vatican on November 18, 1957. The Diocese is organized as a religious Diocesan Corporation under Minn. Stat. § 315.16.

The Diocese is one of the most rural dioceses in the country and has a strong heritage as a community close to the land. The Diocese serves a geographical area of approximately 9,863

square miles, consisting of 15 southwestern Minnesota counties, including Big Stone, Brown, Chippewa, Kandiyohi, La qui Parle, Lincoln, Lyon, McLeod, Meeker, Nicollet, Redwood, Renville, Sibley, Swift, and Yellow Medicine (the "Diocese's Region"). There are approximately 57,500 Catholic individuals, which make up approximately 20% of the total population, in the Diocese's Region.

The Most Reverend John M. LeVoir is the fourth bishop of the Diocese. Bishop LeVoir was installed in 2008.

The Diocese maintains a number of offices, including Catholic Charities (responsibilities include providing counseling services and supplying emergency resources to people in need), Catholic Schools (responsibilities include providing educational resources and leadership development), Chancellor (responsibilities include administrative services and maintenance of diocesan records archives), Communications (responsibilities include producing *The Prairie Catholic*, maintaining the Diocese's website, and scheduling programming for public access television), Permanent Diaconite (responsibilities include recruitment, education, and formation of candidates for permanent diaconite), Development (responsibilities include supervising all charitable trust funds donated to the Diocese and providing resources to those considering donating to the Diocese), Family Life (responsibilities include providing marriage preparation, family programs, and other education),  Finance (responsibilities include overseeing the accounting, budgeting, and financial administration for the Diocese), Healing Ministry (responsibilities include providing healing and counseling services to those affected by past trauma), Hispanic Ministry (responsibilities include assisting Parishes minister to growing population of Hispanic Catholics), Marriage Tribunal (responsibilities include directing the Church process concerning the validity of marriages ending in divorce, facilitating the formal diocesan mediation process, and providing canonical consultation to the staff of the Diocese), Religious Education & Adult Faith Formation (responsibilities include providing resources regarding the Rite of Christian Initiation for Adults and other faith formation, scheduling educational lectures, and financial support for catechism scholarship), Safe Environment (responsibilities include establishing and maintaining "safe environment" programs, including the Code of Conduct, criminal background checks, and sexual abuse awareness and prevention training), Social Concerns (responsibilities include assisting in the formation and development of area/Parish social concerns committees and promoting Catholic social teaching, works of mercy, advocacy, action for justice, and pro-life activity), Vocations (responsibilities include recruitment, education, and formation of seminarians and candidates for seminary),Worship (responsibilities include providing liturgical resources and other educational material), and Youth & Young Adult Ministry (responsibilities include youth outreach and youth-based Catholic programs).

As of the Filing Date, the Diocese's Region contained 74 Catholic Parishes. Each Parish is a separately incorporated religious corporation, organized and existing under Minn. Stat. § 315.15. As of the Filing Date, there were 18 Catholic schools located in the Diocese's region. These schools educate students from pre-kindergarten through high school, with a total enrollment of approximately 1,858 students. The majority of the schools are owned, operated, and controlled by a specific Parish. The minority of schools that exist independently are incorporated under either Chapter 317(A) of the Minnesota Statutes or Minn. Stat. § 315.16.

There are various other Catholic-based social and community service organizations operating within the Diocese's Region, including two Catholic hospitals and six Catholic nursing homes. These other Catholic entities are separately incorporated as non-profit corporations under either Chapter 317(A) of the Minnesota Statutes or Minn. Stat. § 315.16.

As a religious organization, the Diocese has no significant, ongoing for-profit business activities or business income. The Diocese's revenue primarily derives from donations from individuals and organizations, parish assessments paid to the Diocese by the Parishes, and investments. The Diocese currently employs 22 individuals, which includes clergy and laity. Under Canon Law, anyone not ordained a deacon, priest, or bishop is a layperson or "laity." In this legal sense, women in a religious order (sisters) and men in a religious order (brothers) are laity.

## B.      Events Leading to the Chapter 11 Case.

In May 2013, the Minnesota legislature enacted the Minnesota Child Victims' Act, Minn. Stat. § 541.073 (the "CVA"), which altered, expanded, and in some circumstances eliminated the statute of limitations applicable to civil causes of action for damages based on sexual abuse. The CVA allows victims who were sexually abused when they were younger than 18 years old to bring a civil lawsuit for damages arising from the abuse, regardless of how long ago the abuse occurred. The CVA also provided a three-year window during which victims whose claims were time barred by the previous statute of limitations could bring civil suits against alleged abusers and the Diocese and Parishes. This window expired May 25, 2016.

The CVA opened the door to a significant number of additional civil claims against the Diocese relating to clergy misconduct spanning a time period of more than half of a century. Prior to the expiration of the three-year window provided by the CVA, 101 pending civil actions were commenced against the Diocese and, in some cases, also against certain Parishes. In total, 28 Parishes were also named as co-defendants in one or more cases.

## III.    EVENTS DURING THE CHAPTER 11 CASE.

## A.      Bankruptcy Filing and First Day Orders.

The Diocese commenced its Chapter 11 Case on the Filing Date by filing a voluntary petition under Chapter 11 of the Bankruptcy Code [Docket No. 1]. The Diocese has continued in possession of its assets and the management of its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

On March 7, 2017, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered orders that, among other things:

1.      Authorized the Diocese to maintain its self-insurance program and pay all claims, premiums, and administrative expenses payable under the self-insurance program [Docket No. 27].

2.      Authorized the Diocese's continued use of its existing cash management system, bank accounts, and business forms [Docket No. 28].

3.      Authorized the Diocese to file under seal a portion of the Schedules, the master mailing matrix, and the list of its twenty largest Creditors that disclose the identifying information of Survivors [Docket No. 29].

4.      Authorized the Diocese to make certain payroll payments to employees and continue certain employee benefit plans and other practices [Docket No. 30].

5.      Established a deadline for filing proofs of claims, approved modified proof of claim forms for Survivors, and approved confidentiality procedures for proofs of claims filed by Survivors [Docket Nos. 33 and 71].

**B.      Schedules and Statements.**

On March 17, 2017, the Diocese filed its Schedules and Statement of Financial Affairs [Docket No. 38].

**C.      Retention and Employment of the Diocese's Professionals.**

During the Chapter 11 Case, the Bankruptcy Court approved the Diocese's retention and employment of the following professionals to assist in the administration of the Diocese's Chapter 11 Case: (1) Fredrikson & Byron, P.A. as bankruptcy counsel to the Diocese [Docket No. 47]; (2) Meier, Kennedy & Quinn, Chartered as special counsel [Docket No. 49]; (3) Blank Rome LLP as special insurance counsel [Docket No. 48]; (4) BGA Management, LLC d/b/a Alliance Management as business and financial consultant [Docket No. 50]; (5) Berens, Rodenberg & O'Connor, Chtd. as general diocesan counsel [Docket No. 92]; (6) Felhaber, Larson, Fenlon & Vogt, P.A. as employment law counsel [Docket No. 93]; (7) James Young & Associates, Ltd. as accountant [Docket No. 94]; Valley Properties, Inc. as real estate broker [Docket No. 95]; and Patchin, Messner, Dodd & Brumm as valuation expert [Docket No. 170].

**D.      Appointment of Official Committee of Unsecured Creditors.**

On April 6, 2017, the United States Trustee appointed the UCC [Docket No. 61]. The Bankruptcy Court approved the UCC's retention of Stinson Leonard Street LLP as the UCC's counsel [Docket No. 68].

**E.      Transfer of Endowment Funds to Investment Accounts.**

On August 25, 2017, the Bankruptcy Court entered an order granting the Diocese's request to waive the requirements of Section 345(b) of the Bankruptcy Code with respect to four endowment funds, permitting the funds to be transferred to investment accounts at Christian Brothers Investment Service that generate  investment income [Docket No. 139].

### F.    Exclusivity Extensions.

On June 29, 2017, October 19, 2017, and February 22, 2018, the Bankruptcy Court entered orders granting the Diocese's request to extend the Diocese's exclusive period to file a plan of reorganization and solicit acceptances of that plan of reorganization ultimately to June 26, 2018, and August 25, 2018, respectively [Docket Nos. 111, 148, and 186]. The Diocese has filed the Plan after the exclusive time period to propose a plan of reorganization, but no other plan of reorganization has been filed.

### G.    Asset Sales.

Beginning prior to the Filing Date, and continuing since the commencement of this Chapter 11 Case, the Diocese has engaged in a process of monetizing certain real estate assets.

#### 1.    *Sale of Single-Family Home Lots.*

Prior to the Filing Date, the Diocese entered into purchase agreements to sell five single-family home lots to two different purchasers for an aggregate total of $215,500. The Diocese filed its Chapter 11 Case prior to the closing of the five sales. On April 12, 2017, the Diocese filed a motion to assume the purchase agreements in order to complete the sales [Docket No. 62], which the Bankruptcy Court granted [Docket No. 77]. The Diocese completed the sales. On October 31, 2017, the Diocese filed a motion to sell an additional single-family home lot for $41,900 [Docket No. 155], which the Bankruptcy Court also granted [Docket No. 164].

#### 2.    *Sale of Hillesheim Farm Property.*

On February 27, 1969, the Hillesheim family donated certain real property commonly referred to as the "Hillesheim Farm Property." On September 11, 2018, the Diocese filed a motion to sell the Hillesheim Farm Property for $1,502,000, which also included the assumption and assignment of two related executory contracts [Docket No. 228]. The Bankruptcy Court granted the Diocese's motion and approved both the sale of the Hillesheim Farm Property and the assumption and assignment of the executory contracts [Docket No. 231]. After the sale was approved, the Diocese completed the sale and currently holds the $1,502,000 in a segregated account.

#### 3.    *Sale of Schneider Farm Property.*

The Diocese owns additional agricultural real property in Brown County, Minnesota, commonly referred to as the "Schneider Farm Property." The Diocese recently filed a motion to sell the Schneider Farm Property for $377,600 [Docket No. 311]. The Bankruptcy Court granted the Diocese's motion and approved the sale of the Schneider Farm Property [Docket No. 330]. The Diocese anticipates completing the sale within three weeks of the date of this Disclosure Statement. The proceeds from the sale of the Schneider Farm Property will be included in the Diocese's contribution to the Trust.

### H. Insurance Coverage Adversary Proceeding.

On March 6, 2017, the Diocese commenced the Insurance Coverage Adversary Proceeding against the Diocese's insurers seeking a declaratory judgment concerning the rights and duties of the Diocese and the insurers under the applicable insurance policies [Adv. Docket No. 1]. To aid in the mediation process and the informal discussions between the Diocese and the insurers, the Diocese and the insurers stipulated to a stay of the Insurance Coverage Adversary Proceeding for 90 days, through June 5, 2017, which was subsequently approved by the Bankruptcy Court [Adv. Docket Nos. 4 and 5]. The Bankruptcy Court has entered orders approving additional stipulations between the Diocese and the insurers that further stayed the Insurance Coverage Adversary Proceeding, ultimately staying the Insurance Coverage Adversary Proceeding indefinitely [Adv. Docket Nos. 9, 14, 22, 26, 29, 34, 40, 43, 46]. On March 15, 2018, the Diocese voluntarily dismissed, without prejudice, Fireman's Fund Insurance Company from the Insurance Coverage Adversary Proceeding [Adv. Docket No. 24].

### I. Meadowbrook Property Interest.

The Diocese holds an interest in an entity called "Meadowbrook Apartments, LLC" ("Meadowbrook") and, pursuant to Meadowbrook's membership agreement and a later guaranty executed by Scott Viele ("Mr. Viele"), Mr. Viele has indicated that he is prepared to pay the Diocese $566,842.51 to either execute and convey the Diocese's membership interest in Meadowbrook to Mr. Viele or otherwise cancel the Diocese's membership interest.

After receiving the communication from Mr. Viele's counsel, the Diocese engaged in a thorough and rigorous review of its files and financial records, and the files and records of other third parties, including Mr. Viele, to attempt to determine the character and value of the Diocese's interest Meadowbrook. Based on the Diocese's investigation, the Diocese determined that it is listed as a holder of a 10% membership interest in Meadowbrook. The Diocese received this membership interest in exchange for a note receivable the Diocese contributed to Meadowbrook in 2003. The Diocese received the note receivable through a series of other financial transactions that originated with a donation to the Diocese. Pursuant to the Operating Agreement of Meadowbrook Apartments, LLC dated March 17, 2003, and a subsequent Membership Agreement dated October 3, 2013, the Diocese appears to be entitled to reimbursement of the full remaining balance of its equity contribution plus interest. Through the Diocese's investigation, the Diocese also discovered that certain other third parties may assert an interest in the Diocese's Meadowbrook interest.

After conducting its investigation, the Diocese amended its schedules to identify the Meadowbrook interest [Docket No. 268]. In the amended schedules, the Diocese listed the value as "Unknown" due to the potential claims that the third parties may assert. The Diocese has provided the UCC with all of the documents and information the Diocese received and reviewed in its investigation.

### J. Settlement Negotiations and Mediations.

On March 23, 2017, the Bankruptcy Court appointed United States Bankruptcy Judge Gregg W. Zive as mediator and directed the Diocese, the UCC, counsel for the Survivor

8

Claimants, and the Diocese's insurance carriers to participate in the mediation [Docket No. 46]. These parties, along with counsel for certain Parishes, participated in three formal mediations sessions with the Judge Zive.

## IV. SUMMARY OF THE PLAN.

*The below summary is provided for the convenience of holders of Claims and Interests. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by references to, the full text of the Plan, including the definitions of terms contained in the Plan. All holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits.*

### A. Overview of Classification and Treatment of Claims and Interests.

Following the requirements of the Bankruptcy Code, all Claims are placed in categories. Most are placed into separate classes, others are unclassified. These categories are described in detail in the Plan and later in this Section of the Disclosure Statement.

The Plan proposes different "treatment" of Claims, depending on their classification under the Plan:

| Class | Designation | Proposed Treatment |
|---|---|---|
| Unclassified | Administrative Expense Claims | Pay Allowed Claims in Cash in Full |
| Unclassified | Priority Claims | Pay Allowed Claims in Cash in Full |
| 1 | Known Survivor Claims | Pro-Rata Share of Trust Assets pursuant to Distribution Plan |
| 2 | Unknown Survivor Claims and Late-Filed Survivor Claims | Pro-Rata Share of Class 2 Reserves pursuant to Distribution Plan |
| 3 | General Unsecured Claims | Pay Allowed Claims in Cash in Full |
| 4 | Parish Claims | Claims Disallowed |

The holders of claims or interests that are classified and are "impaired" are entitled to vote on the Plan. The classes that are entitled to vote under the Plan are:

Class 1: Known Survivor Claims

Class 2: Unknown Survivor Claims and Late-Filed Survivor Claims

Class 4: Parish Claims

### B. Description of Classes and Treatment.

The following is a description of Claims, classes, and treatment. The treatment is taken from the Plan, but additional information and descriptions regarding the claims and various estimates are provided in this Disclosure Statement. In case of inconsistency, the Plan controls.

1.      *Allowed Administrative Expense Claims.*

Except as otherwise provided in the Plan, the holder of an Allowed Administrative Expense will receive, in full satisfaction of such Allowed Administrative Expense: (a) payment in full in cash as soon as practicable after the later of: (i) the Effective Date, or (ii) the date the Administrative Expense becomes Allowed; or (b) such other treatment as agreed in writing by the holder thereof or ordered by the Bankruptcy Court.

i.      Professional Fees and Expenses.

Professional fees and expenses incurred through the Effective Date and not previously Allowed will be subject to Bankruptcy Court approval after the Effective Date. All holders of professional fees and expenses claims shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) days after a notice of the Effective Date is filed. Any such Allowed Claims will be paid from retainers or by the Reorganized Debtor in cash within ten (10) days of the later of the Effective Date or the Bankruptcy Court's order on such Claims.

ii.     Claims Arising under Assumed Executory Contracts or Unexpired Leases.

The holders of Allowed Cure Amount Claims will receive, in full satisfaction of such Cure Amount Claim: (a) payment of the amount as set forth on <u>Exhibit G</u> to the Plan in cash, as soon as practicable after the Effective Date; or (b) such other treatment as agreed in writing by the holder thereof or ordered by the Bankruptcy Court.

2.      *Statutory Fees and Court Costs.*

Court costs and fees payable by the Diocese under 28 U.S.C. § 1930 will be paid in full in cash on the Effective Date or as soon as practicable thereafter or as required under the Office of the United States Trustee's quarterly payment guidelines.  The Diocese estimates these Claims will be nominal, as it has remained current on the payments.  After confirmation, the Reorganized Debtor will continue to pay quarterly fees to the Office of the United States Trustee and file quarterly reports with the Office of the United States Trustee until this case is closed by the Bankruptcy Court, dismissed or converted.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.  In the event the Trustee opposes the closure of the Chapter 11 Case, the Trust will be responsible for the payment of all Statutory Fees and Court Costs from the date of the filing of any such opposition through the closure of the Chapter 11 Case.  The Trust will be responsible for the payment of Statutory Fees and Court Costs should the Trustee reopen the Chapter 11 Case in the future.  In the event that the Trust fails to pay any applicable Statutory Fees or Court Costs, the Diocese may pay the applicable Statutory Fees or Court Costs and seek reimbursement from the Trust. This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

3. *Unsecured Priority Claims.*

i. Priority Tax Claims.

The holder of an Allowed Priority Tax Claim will receive, in full satisfaction of such Allowed Priority Tax Claim: (a) payment in full of the unpaid amount of such Allowed Priority Tax Claim in cash as soon as practicable after the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; or (b) such other treatment as agreed in writing by the holder thereof or ordered by the Bankruptcy Court.

Notwithstanding the provisions of Section 3.3.1(a) of the Plan, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty shall be subject to treatment in Class 3 (General Unsecured Claims), if not subordinated to Class 3 claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Diocese, the Reorganized Debtor, or their respective property.

ii. Employee Priority Claims.

The holder of an Allowed Employee Priority Claim will receive, in full satisfaction of such Allowed Employee Priority Claim: (a) payment in full of the unpaid amount of such Allowed Employee Priority Claim in cash as soon as practicable after the later of (i) the Effective Date, or (ii) the date such Allowed Employee Priority Claim becomes Allowed; or (b) such other treatment as agreed in writing by the holder thereof or ordered by the Bankruptcy Court.

iii. Other Priority Claims.

The holder of an Allowed Claim not specifically treated in this section and entitled to priority under Bankruptcy Code Section 507(a) will receive, in full satisfaction of such Allowed Claim: (a) payment in full in cash as soon as practicable after the later of: (i) the Effective Date, or (ii) the date the Claim becomes Allowed; or (b) such other treatment as agreed in writing by the holder thereof or ordered by the Bankruptcy Court.

4. *Class 1: Known Survivor Claims.*

This class consists of all Known Survivor Claims. The Diocese and UCC are unable to estimate the amount of the Known Survivor Claims because the Known Survivor Claims are contingent and unliquidated.

On and after the Effective Date, liability for Class 1 Claims shall be assigned to and assumed and treated by the Trust as further provided in Article IV of the Plan, the Trust Agreement, and the Survivor Claim Distribution Plan. The Survivor Claim Distribution Plan provides a point allocation system for the evaluation of the Known Survivor Claims and to provide a basis for the eventual distribution to holders of Known Survivor Claims. Holders of Allowed Class 1 Claims shall receive a distribution from the Trust pursuant to the Survivor Claim Distribution Plan.

5. *Class 2: Unknown Survivor Claims and Late-Filed Survivor Claims.*

This class consists of all Unknown Survivor Claims and Late-Filed Survivor Claims. The Diocese is unable to estimate the amount of the Class 2 Claims because the Class 2 Claims are either currently unknown and/or contingent and unliquidated.

On and after the Effective Date, liability for Class 2 Claims shall be assumed and treated by the Trust as further provided in Article IV of the Plan, the Trust Agreement, and the Survivor Claim Distribution Plan. The Trust shall establish the Class 2 Reserves as provided in the Trust Agreement and the Plan. The Survivor Claim Distribution Plan provides a point allocation system for the evaluation of the Class 2 Claims and to provide a basis for the eventual distribution to holders of Allowed Class 2 Claims. Holders of Allowed Class 2 Claims shall receive a distribution from the Class 2 Reserves pursuant to the Survivor Claim Distribution Plan.

6. *Class 3 – General Unsecured Claims.*

This class consists of all general unsecured claims. The holder of an Allowed General Unsecured Claim will receive, in full satisfaction of such Allowed General Unsecured Claim: (a) payment in full of such Allowed General Unsecured Claim on the Effective Date or as soon as practicable thereafter; or (b) such other treatment as agreed in writing by the holder thereof or ordered by the Bankruptcy Court. There will be no interest or penalties payable on any General Unsecured Claim.

7. *Class 4 – Parish Claims.*

This class consists of every Claim held by a Parish as of the Petition Date, including but not limited to Claims based upon (i) reimbursement for overpayments to the self-insurance fund maintained by the Diocese, (ii) reimbursement for overpayments to the group insurance fund maintained by the Diocese, (iii) indemnification and contribution relating to Abuse, (iv) coverage under a Settling Insurer Policy, (v) the Diocese's use of donations received as part of its annual appeal for donations, and (vi) the Diocese's use of funds held in trust.

The Diocese has reached a global settlement with the Parishes, which is embodied in the Plan. As one component thereof, and to maximize recovery for Survivor Claimants, the Parishes have agreed to receive no distribution on account of their Class 4 Claims. There will be no distribution to the holders of any Class 4 Claims on account of such Class 4 Claims.

## C.   Creation of Trust.

On or before the Confirmation Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Diocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated within the Plan.

12

1.      *Trust Assets.*

The Diocese will transfer $7,000,000 to the Trust within two business days after the Confirmation Order has become a Non-Appealable Order. The Diocese will transfer all Claims or Causes of Action that the Diocese may hold against any and all Other Insurers, to the extent the Diocese holds any such Claims or Causes of Action, to the Trust.  The Parishes will transfer $1,000,000 to the Trust within two business days after the Confirmation Order has become a Non-Appealable Order.  Each Settling Insurer will pay its Insurance Settlement Amount to the Trust within the time set forth in each such Insurance Settlement Agreement.  The total amount paid by the Settling Insurers will be $26 million.

On the Effective Date, all Trust Assets shall vest in the Trust, and the Diocese and other Protected Parties shall be deemed for all purposes to have transferred all Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor or any other Protected Party, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets in accordance with this paragraph, the Diocese and other Protected Parties shall have no further Interest in or with respect to the Trust Assets, except as to the Reorganized Debtor's remainder Interest in the Class 2 Reserves, to the extent there are such remaining funds as detailed in Sections 5.2 and 5.3 of the Plan.

Distributions on Class 1 Claims will be determined by the Survivor Claims Reviewer in accordance with the Plan, the Trust Agreement, and the Survivor Claim Distribution Plan.  All fees, costs, and expenses of administering the Trust as provided in the Plan and the Trust Agreement shall be paid by the Trust, including: (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses of the Trust (including any taxes imposed on the Trust and any professional fees); (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement; and (iv) to pay the Survivor Claims Reviewer's fees for the review of Class 1 Claims.  The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person from liability arising from or related to Known Survivor Claims as expressly set out in the Plan shall be made solely from and shall not exceed the funds in the general corpus.

2.      *Trust Reserves.*

i.      Pre-Effective Date Unknown Claim Reserve.

The Trust shall establish the Pre-Effective Date Unknown Claim Reserve.  After the Survivor Claims Reviewer determines that there are one or more valid Pre-Effective Date Unknown Claims, the Trust shall contribute $250,000 from the Trust Assets to the Pre-Effective Date Unknown Claim Reserve and the Diocese shall separately contribute an additional $250,000 to the Pre-Effective Date Unknown Claim Reserve.  For the avoidance of doubt, the Diocese's $250,000 contribution is separate from, and in addition to, the Diocese's contribution to the Trust pursuant to Section 5.1.1 of the Plan.  The Pre-Effective Date Unknown Claim Reserve shall be administered as provided in the Trust Agreement and Survivor Claim Distribution Plan. The Trust shall maintain the Pre-Effective Date Unknown Claim Reserve until the payment of all allowed Pre-Effective Date Unknown Survivor Claims.  One-half of any funds

that remain in the Pre-Effective Date Unknown Claim Reserve shall be returned to the Reorganized Debtor within 30 days of the completion of payments to holders of all allowed Pre-Effective Date Unknown Survivor Claims. The remaining half of such funds shall be retained by the Trust, with no further restrictions on the Trust's use of such funds except for the general restrictions on use of Trust Assets provided for in the Trust Documents.

Distributions on Pre-Effective Date Unknown Survivor Claims will be determined by the Survivor Claims Reviewer in accordance with the Plan, the Trust Agreement, and the Survivor Claim Distribution Plan. All fees, costs, and expenses of administering the Pre-Effective Date Unknown Claim Reserve as provided in the Plan and the Trust Agreement shall be paid by the Trust from the Pre-Effective Date Unknown Claim Reserve, including reasonable administrative expenses associated with the Pre-Effective Date Unknown Claim Reserve and evaluation of Pre-Effective Date Unknown Survivor Claims by the Survivor Claims Reviewer.

ii.      Post-Effective Date Unknown Claim Reserve

The Trust shall establish the Post-Effective Date Unknown Claim Reserve. The Trust shall contribute $200,000 from the Trust Assets to the Post-Effective Date Unknown Claim Reserve and the Diocese shall separately contribute an additional $200,000 to the Post-Effective Date Unknown Claim Reserve. For the avoidance of doubt, the Diocese's $200,000 contribution is separate from, and in addition to, the Diocese's contribution to the Trust pursuant to Section 5.1.1 of the Plan. The Trust shall maintain the Post-Effective Date Unknown Claim Reserve until the earlier of (i) the exhaustion of the Post-Effective Date Unknown Claim Reserve or (ii) the occurrence of the fifth (5th) anniversary of the Effective Date. One-half of any funds that remain in the Post-Effective Date Unknown Claim Reserve on the fifth anniversary of the Effective Date shall be returned to the Reorganized Debtor and the other half of such funds shall be retained by the Trust, with no further restrictions on the Trust's use of such funds except for the general restrictions on use of Trust Assets provided for in the Trust Documents.

Distributions on Post-Effective Date Unknown Survivor Claims will be determined by the Survivor Claims Reviewer in accordance with the Plan, the Trust Agreement, and the Survivor Claim Distribution Plan. All fees, costs, and expenses of administering the Post-Effective Date Unknown Claim Reserve as provided in the Plan and the Trust Agreement shall be paid by the Trust from the Post-Effective Date Unknown Claim Reserve, including reasonable administrative expenses associated with the Post-Effective Date Unknown Claim Reserve and evaluation of Post-Effective Date Unknown Survivor Claims by the Survivor Claims Reviewer.

iii.      Late-Filed Claim Reserve.

The Trust shall establish the Late-Filed Claim Reserve. The Trust shall contribute $20,000 from the Trust Assets to the Late-Filed Claim Reserve and the Diocese shall separate contribute an additional $20,000 to the Late-Filed Claim Reserve. For the avoidance of doubt, the Diocese's $20,000 contribution is separate from, and in addition to, the Diocese's contribution to the Trust pursuant to Section 5.1.1 of the Plan. The Late-Filed Claim Reserve shall be administered as provided in the Trust Agreement and Survivor Claim Distribution Plan. The Trust shall maintain the Late-Filed Claim Reserve until the earlier of (i) the exhaustion of the Late-Filed Claim Reserve or (ii) the occurrence of the fifth (5th) anniversary of the Effective

14

Date. One-half of any funds that remain in the Late-Filed Claim Reserve on the fifth anniversary of the Effective Date shall be returned to the Reorganized Debtor and the other half of such funds shall be retained by the Trust, with no further restrictions on the Trust's use of such funds except for the general restrictions on use of Trust Assets provided for in the Trust Documents.

Distributions on Late-Filed Claims will be determined by the Survivor Claims Reviewer in accordance with this Plan, the Trust Agreement, and the Survivor Claim Distribution Plan. All fees, costs, and expenses of administering the Late-Filed Claim Reserve as provided in the Plan and the Trust Agreement shall be paid by the Trust from the Late-Filed Claim Reserve, including reasonable administrative expenses associated with the Late-Filed Claim Reserve and evaluation of Late-Filed Claims by the Survivor Claims Reviewer.

      *3.*      *Trust Liability.*

On the Effective Date, the Trust shall automatically and without further act or deed assume: (i) all liability, if any, of the Protected Parties and Settling Insurers in respect of Channeled Claims, subject to Section 13.14 of the Plan; and (ii) the responsibility for preserving and managing Trust Assets and distributing Trust Assets.

**D.**     **Distributions and Claims Administration.**

      *1.*      *Survivor Claims.*

Each Survivor Claim will be assessed by the Survivor Claims Reviewer in accordance with the Survivor Claim Distribution Plan to determine whether the Survivor Claimant is entitled to a distribution. The Diocese or the Reorganized Debtor shall reasonably cooperate with the Survivor Claims Reviewer and the Trustee as requested by the Survivor Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Survivor Claim Distribution Plan.

A Survivor Claimant, who the Survivor Claims Reviewer determines to be entitled to a distribution, will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Survivor Claim Distribution Plan. Any payment on a Survivor Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. For the avoidance of doubt, Survivor Claimants' recovery on their Survivor Claims shall be limited to the distributions they are entitled to, if any, from the Trust under the Survivor Claim Distribution Plan, and they shall not be entitled to collect personally or otherwise any additional amounts whatsoever on their Survivor Claims from any Protected Party or any Protected Party's assets, or from any Settling Insurers or Settling Insurers' assets in respect of the Protected Party's coverage under any Settling Insurer Policies, even if they are denied a distribution pursuant to the Survivor Claim Distribution Plan. For the avoidance of doubt, the Class 2 Reserves, established by the Trust and funded by the Trust and Reorganized Debtor, shall be the sole source of payment to Class 2 Claimants on account of Class 2 Claims. Survivor Claimants' recovery on their Class 2 Claims shall be limited to the distributions they are entitled to, if any, under the Survivor Claim Distribution Plan, and they shall not be entitled to collect personally or otherwise any additional amounts whatsoever on their Class 2 Claims from the

Trust, any Protected Party, any Protected Party's assets, any Settling Insurers or any Settling Insurers' assets in respect of the Protected Party's coverage under any Settling Insurer Policies, even if they are denied a distribution pursuant to the Survivor Claim Distribution Plan.

Prior to any Survivor Claimant receiving a payment from the Trust, the Claimant shall sign the Release attached as <u>Exhibit E</u> to the Plan.

Within 21 days after the Effective Date, all Claims arising out of, or related to, Survivor Claims asserted in any lawsuit against any Protected Party currently pending in state court shall be dismissed with prejudice and without fees or costs being recoverable against any Protected Party or by any Protected Party against the Survivor Claimant.

Any objection asserted by the Diocese to a Survivor Claim pending as of the Effective Date is deemed withdrawn without prejudice. Whether and the extent to which any Settling Insurer who filed an objection prior to the Effective Date is entitled to have filed such objection and to continue to assert such objection after the Effective Date shall be determined by the Bankruptcy Court in accordance with applicable procedures. As of the Effective Date, the Trustee shall have the sole and exclusive right to object to Survivor Claims. The Reorganized Debtor shall have no right to object to any Survivor Claims after the Effective Date.

A Survivor Claimant may withdraw his or her Survivor Claim at any time on written notice to the Trustee. If withdrawn, (a) the Survivor Claim will be withdrawn with prejudice and may not be reasserted, and such Survivor Claimant shall still be subject to the Discharge, the Channeling Injunctions, and the Supplemental Insurer Injunction as provided by this Plan; and (b) any reserve maintained by the Trust on account of such Survivor Claim shall revert to the Trust as a Trust Asset for distribution in accordance with the Plan and Survivor Claim Distribution Plan.

2.    *Distributions for Claims Other Than Survivor Claims.*

i.    Method of Payment.

Unless otherwise provided in the Plan, distributions for Claims other than Survivor Claims shall be made by the Reorganized Debtor.

Except with respect to Survivor Claims, payments under this Plan will be made by check, mailed with first class postage pre-paid, to the holder of each Claim at the address listed on its Proof of Claim as of the Record Date, or if no Proof of Claim has been filed by the date of the hearing on confirmation, to the address listed on the Schedules as of the Record Date. Holders of Claims as of the Record Date may contact the Reorganized Debtor to amend their addresses as follows:

The Diocese of New Ulm
Attention: Thomas Holzer
Catholic Pastoral Center
1421 6th Street North
New Ulm, MN 56073

16

      ii.     Claim Objections and Administration.

Except with respect to Survivor Claims, the Reorganized Debtor shall have and retain any and all objections to any and all Claims and motions or other requests for the payment of Claims, whether Administrative Expense, secured, or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, priority tax Claims, liens and security interests, whether under the Bankruptcy Code, other applicable law, or contract.

Except with respect to Survivor Claims or Administrative Expenses, any objections to Claims will be filed within ninety (90) days after the Effective Date (unless such day is not a business day, in which case such deadline will be the next business day thereafter) or at such later date as approved by the Bankruptcy Court upon request from the Reorganized Debtor. Any Claim objections arising solely under 11 U.S.C. § 502(d) are not subject to the 90 day deadline and may be pursued through an adversary proceeding asserting an Avoidance Claim. An objection to a Claim will be deemed properly served on the holder of the Claim if the Reorganized Debtor effects service by any of the following methods: (a) in accordance with Federal Rule of Civil Procedure 4, as made applicable by Bankruptcy Rule 7004; (b) by first class mail on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (c) by first class mail on any counsel that has appeared on the behalf of the claimholder in the Chapter 11 Case.

Notwithstanding any other provision in the Plan, no payments or distributions will be made with respect to all or any portion of a Disputed Claim, other than a Survivor Claim, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Non-Appealable Order, and the Disputed Claim has become an Allowed Claim.

Notwithstanding any other provision hereof, no payments or distributions will be made with respect to all or any portion of a Disputed Claim, other than a Survivor Claim, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Non-Appealable Order, and the Disputed Claim has become an Allowed Claim.

      iii.    Other Provisions Regarding Claims and Distributions.

Except with respect to Survivor Claims, the Diocese may request estimation or limitation of any Disputed Claim that is contingent or unliquidated pursuant to Bankruptcy Code Section 502(c); provided, however, that the Bankruptcy Court will determine: (a) whether such Disputed Claim is subject to estimation pursuant to Bankruptcy Code Section 502(c), and (b) the timing and procedures for such estimation proceedings, if any. Unless provided otherwise in an order of the Bankruptcy Court, the estimated amount shall constitute the Allowed amount of such Claim or a maximum limitation on such Claim, as the Bankruptcy Court may direct; provided, however, that if the estimate constitutes the maximum limitation on such Claim, the Diocese may elect to pursue supplemental proceedings to object to the ultimate allowance of such Claim. The foregoing shall not limit the rights granted by Bankruptcy Code Section 502(j).

Notwithstanding any other provision in the Plan, no payment or distribution will be made with respect to all or any portion of a Claim or Allowed Claim held by a claimant against whom

an Avoidance Claim or Cause of Action is asserted unless and until such Avoidance Claim or Cause of Action has been settled or withdrawn or has been determined by Non-Appealable Order.

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Reorganized Debtor shall distribute to the holder thereof the distribution(s) to which the holder is then entitled under the Plan. Such distribution, if any, shall be made as soon as practicable after the entry of the Non-Appealable Order allowing the Claim.

The Record Date for Claim transfers is the Confirmation Date. Claim transfers will not be recognized after the Confirmation Date. Payment under the Plan will be mailed to the address of the holder of the Claim as of the Record Date until the holder of the Claim as of the Record Date notifies the Reorganized Debtor in writing of a different address.

The Reorganized Debtor shall not be required to make any payment of less than twenty-five dollars ($25.00) with respect to any Allowed General Unsecured Claim.

In the event a payment is returned to the Reorganized Debtor unclaimed, with no indication of the payee's forwarding address, the Reorganized Debtor will hold such payment for a period of 90 days from the date of return. If not claimed by the payee by the end of that period, the funds will be retained by the Reorganized Debtor.

Checks issued by the Reorganized Debtor shall be null and void if not negotiated within 90 days from and after the date of issuance. Requests for re-issuance of any check shall be made to the Reorganized Debtor by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check must be made on or before 120 days after the date of issuance of such check. After 120 days after issuance of a non-negotiated check for which the holder of the Allowed Claim did not request re-issuance, all claims in respect of voided checks shall be Discharged and forever barred.

The Reorganized Debtor may, pursuant to applicable non-bankruptcy law, set off against any distribution(s) to be made pursuant to the Plan, the claims, rights, and Causes of Action of any nature the Diocese may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights, and Causes of Action that the Diocese may hold against such holder.

### E.     Executory Contracts and Unexpired Leases.

Each Assumed Agreement shall be assumed as of the Effective Date, to the extent that each such Assumed Agreement has not already expired, concluded, or terminated under its own terms. All other executory contracts, unexpired leases, or other agreements that are not Assumed Agreements and were not previously assumed or rejected by order of the Bankruptcy Court in the Chapter 11 Case shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute, pursuant to Bankruptcy Code Sections 365 and 1123, the approval of the rejection of all such executory contracts and unexpired leases.

Payments of any Cure Amount Claims relating to the Assumed Agreements shall be made pursuant to Plan Section 3.1.2.

To the extent not subject to a claim filing deadline set forth in any prior or subsequent order of the Bankruptcy Court, claims arising out of the rejection of an executory contract or unexpired lease pursuant to Plan Section 11.1, must be filed with the Bankruptcy Court no later than 30 days after the entry of the Confirmation Order and, upon allowance, shall be an Allowed General Unsecured Claim. Any Claims not filed within such applicable time periods shall be forever barred from receiving a distribution from the estate, the Diocese, or the Reorganized Debtor.

**F.    Conditions to Effective Date.**

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until each of the following conditions have been satisfied:

- The Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Order shall be a Non-Appealable Order, and no stay of the Confirmation Order shall then be in effect;

- All Insurance Settlement Agreements shall have been duly executed by all parties thereto and filed with the Bankruptcy Court, in each case in form and substance satisfactory to the Diocese, the UCC, and the Settling Insurers;

- The Trustee and the Reorganized Debtor shall have executed the Trust Agreement;

- All Approval Orders shall have become Non-Appealable Orders;

- The payments discussed in Subsections 5.1.1 and 5.1.2 of the Plan shall have been received by the Trust;

- The Plan has not been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with consent of the Diocese.

The Plan Proponents shall file a notice with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date. Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties or the Settling Insurers; (ii) prejudice in any manner the rights of the Protected Parties, the Trust, or the Settling Insurers; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or the Settling Insurers in any respect, including but not limited to, in any proceeding or case

19

against the Diocese or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum.

### G.     Effects of Confirmation.

#### 1.     *Discharge.*

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Diocese will be Discharged from, and its liability will be extinguished completely in respect to, any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, that arose before the Confirmation Date,  including, without limitation, all Interest, if any, on any such Claims and debts, whether such Interest accrued before or after the Filing Date, and including all Claims and debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under Bankruptcy Code Section 501, such Claim is Allowed under Bankruptcy Code Section 502, or the holder of such Claim has accepted the Plan.

#### 2.     *Title to and Vesting of Assets.*

All property of the Diocese and the estate is dealt with by this Plan; therefore, on the Effective Date, to the full extent allowed by Bankruptcy Code Sections 1141(b) and 1141(c), all property of the Diocese and the estate, including Retained Claims, shall vest in the Reorganized Debtor and such property shall be free and clear of all Interests of creditors and equity security holders, except to the extent the Plan explicitly provides that such Interests are retained. From and after the Effective Date, the Reorganized Debtor may operate, use, acquire, and dispose of property in accordance with the Plan, free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in this Plan. The Reorganized Debtor may pursue any Retained Claims at the discretion of the Reorganized Debtor and will retain the proceeds thereof, if any.

#### 3.     *Corporate Action.*

On the Effective Date, all matters provided for herein that would otherwise require approval of the management of the Diocese shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of Minnesota, without any requirement of further action by the management of the Diocese.

#### 4.     ***Exculpation and Limitation of Liability.***

**From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim, Cause of Action, or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Case or in connection with the preparation and filing of the Chapter 11**

Case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, the formulation and negotiation of an Insurance Settlement Agreement, or the seeking or obtaining of an Approval Order related to an Insurance Settlement Agreement, except for Claims, Causes of Action, or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the UCC and the Diocese and their respective officers, board and committee members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of Bankruptcy Code Section 1125(e) and the Channeling Injunction.

5.    *Limitation of Liability.*

The Protected Parties, the Trust, the Trustee, and professionals employed by the foregoing shall not have any liability to any entity, including any governmental entity or Insurer, on account of payments made to a Survivor Claimant, including any liability under the MSPA.

6.    ***Channeling Injunction.***

In consideration of the undertakings of the Protected Parties and the Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Diocese and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurers, and pursuant to Bankruptcy Code Section 105 and 363:

a.    any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

b.    any and all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:

(1)    commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers or against the property of any of the Protected Parties or the Settling Insurers;

(2)    enforcing, attaching, collecting or recovering, or seeking to accomplish any of the preceding, by any manner or means, from any of the

21

Protected Parties or the Settling Insurers, or the property of any of the Protected Parties or the Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers;

(3)     creating, perfecting, or enforcing, or seeking to accomplish any of the preceding, any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurers, or the property of the Protected Parties or the Settling Insurers;

(4)     asserting, implementing, or effectuating, any Channeled Claim of any kind against:

A.     any obligation due any of the Protected Parties or the Settling Insurers;

B.     any of the Protected Parties or the Settling Insurers; or

C.     the property of any of the Protected Parties or the Settling Insurers.

(5)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

(6)     asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of the Settling Insurers.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in this section shall inure to the benefit of the Protected Parties and Settling Insurers. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, from the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

7.     *Supplemental Settling Insurer Injunction.*

Pursuant to Bankruptcy Code Sections 105(a) and 363 and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including certain Settling Insurers' purchase of the applicable Settling Insurer Policies free and clear of all Interests pursuant to Bankruptcy Code Section 363(f), any and all Persons who have held, now hold, or who may in the future hold any Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax and regulatory authorities, lenders, trade and other creditors, Survivor Claimants, Other Insurers, perpetrators and all others holding Interests of any kind or nature whatsoever, including

22

those Claims released or to be released pursuant to an Insurance Settlement Agreement) against any of the Protected Parties or the Settling Insurers, which, directly or indirectly, arise from, relate to, or are in connection with any Survivor Claims that are covered or alleged to be covered under the Settling Insurer Policies, or any Related Insurance Claims related to such Survivor Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers, Settling Insurer Policies, or Protected Parties to the extent such Interests arise from the same injury or damages asserted in connection with a Survivor Claim, including:

      a.      commencing or continuing in any manner any action or other proceeding, whether legal, equitable or otherwise, against the Protected Parties or the Settling Insurers or the property of the Protected Parties or the Settling Insurers;

      b.      enforcing, attaching, collecting, or recovering, or seeking to do any of the preceding, by any manner or means, any judgment, award, decree or order against the Protected Parties or the Settling Insurers or the property of the Protected Parties or the Settling Insurers;

      c.      creating, perfecting, or enforcing, or seeking to do any of the preceding, any lien of any kind against the Protected Parties or the Settling Insurers or the property of the Protected Parties or the Settling Insurers;

      d.      asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to the Protected Parties or the Settling Insurers or the property of the Protected Parties or the Settling Insurers; and

      e.      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.

      *8.*      *Protected Parties' Waiver and Consent.*

In consideration of the releases and Channeling Injunction, the Supplemental Settling Insurer Injunction, and other covenants set forth herein, subject to the occurrence of the Effective Date, each of the Protected Parties:

      i.      irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims and/or Interests it has or might have now or in the future against the other Protected Parties, the Reorganized Debtor, and the Settling Insurers with respect to any and all Related Insurance Claims, any contribution, subrogation, indemnification, or other similar Claim

arising from or relating to Survivor Claims covered or alleged to be covered under the Settling Insurer Policies, and any Settling Insurer Policies; and

ii.    consents to the sale of Protected Parties' Claims and/or Interests, if any, in certain Settling Insurer Policies in accordance with certain Insurance Settlement Agreements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan.

9.    *Debtor Waiver and Release of Claims.*

In consideration of any payments to be made by the Settling Insurers and other consideration provided by each Settling Insurer, upon payment by the Settling Insurers of their respective settlement amounts under the corresponding Insurance Settlement Agreements, the Diocese irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests it has or might have now or in the future (a) under the Settling Insurer Policies to the extent those Settling Insurer Policies are bought back under any Insurance Settlement Agreement and this Plan; (b) against the Settling Insurers and/or any of the other Protected Parties with respect to any Channeled Claim, including any Survivor Claim.

10.    *Injunctions in Full Force and Effect.*

All injunctions and/or stays provided for in the Plan, the injunctive provisions of Bankruptcy Code Sections 524 and 1141, and all injunctions or stays protecting any Settling Insurer that has purchased its policies of insurance or certificates of insurance, free and clear of all liens, Claims, and Interests pursuant to Bankruptcy Code Sections 105, 363, and 1123, are permanent and will remain in full force and effect following the Effective Date of the Plan and are not subject to being vacated or modified. The injunctions and releases contained in the Plan shall control notwithstanding any other provision in the Plan or in any Insurance Settlement Agreement.

11.    *Injunctions Critical.*

The foregoing injunctive provisions are an integral part of the Plan and are essential to its implementation. Any and all currently pending court proceedings, the continuation of which would violate the provisions of Article 13 of the Plan or the releases provided for under the Plan or Insurance Settlement Agreements shall be dismissed with prejudice.

12.    *Indemnity for Channeled Claims.*

From and after the Effective Date, the Trust shall defend, indemnify, and hold harmless the Settling Insurers with respect to any and all Survivor Claims, Related Insurance Claims, and Medicare Claims.  Pursuant to the Insurance Settlement Agreements approved by the Bankruptcy Court and incorporated by reference into the Plan, the Diocese, the Parishes, and the Reorganized Debtor shall defend, indemnify, and hold harmless the Settling Insurers with respect to any Survivor Claims and other released and Channeled Claims from and after the Effective Date, subject to any limitations in the Insurance Settlement Agreements.

13.    *Defense and Indemnity for Covered Non-Survivor Claims.*

After the Effective Date, the Reorganized Debtor will defend and indemnify any Protected Party with respect to any Covered Non-Survivor Claims, and, if so required by the Insurance Settlement Agreements, will defend and indemnify the Settling Insurers with respect to any Covered Non-Survivor Claims. As to any Claim against the Trust that qualifies as a Covered Non-Survivor Claim, the Reorganized Debtor will also undertake on behalf of the Trust the enforcement of the injunctions set forth in the Plan, will defend the Covered Non-Survivor Claim, and, if judgment is entered on such Claim, will indemnify the Trust for any liability for such Claim. The Reorganized Debtor may not seek insurance coverage for the Claims defended or indemnified under this Section from the Settling Insurers under any Settling Insurer Policy. Nothing in this provision or any other Plan provision is intended to suggest that any Person is entitled to obtain a judgment on a Covered Non-Survivor Claim or other Enjoined Claim, that such judgment would be covered under any Settling Insurer Policy, or that any Person is entitled to seek coverage for such judgment against any Protected Party or Settling Insurer in violation of the Discharge, Channeling Injunction, or Supplemental Settling Insurer Injunction. For the avoidance of doubt, nothing contained in this Section or the Plan is intended to provide, expand, modify or add coverage for the Diocese or any other Protected Party under any Settling Insurer Policy to cover the Diocese's indemnification of any Covered Non-Survivor Claims.

14.    *Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes.*

The Diocese and Reorganized Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan. Pursuant to Bankruptcy Code Section 1146(a), the following shall not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, or similar tax: (a) the creation of any mortgage, deed of trust, lien, or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to this Plan.

15.    *Cancellation of Instruments.*

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Diocese, except such instruments that are authorized or issued under this Plan, shall be cancelled and extinguished. The holders of, or parties to, the cancelled notes and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except any rights provided pursuant to this Plan.

25

16.    *Dissolution of the Committee.*

On the Effective Date, the UCC shall be dissolved, and the members thereof and the professionals retained thereby shall be released and discharged from their respective fiduciary obligations.

**H.    Child Protection Protocols.**

The Child Protection Protocols are incorporated into the Plan.

**V.    POST CONFIRMATION MANAGEMENT OF THE DIOCESE.**

The Diocese will, as the Reorganized Debtor, continue to exist after the Effective Date with all rights and powers of a non-profit corporation under the laws of the State of Minnesota. On and after the Effective Date, the Diocese will continue to operate in accordance with the principles of its mission statement, Canon Law, and applicable statute. The persons proposed to serve as directors and officers of the Reorganized Debtor are identified in Exhibit J to the Plan and are as follows:

| Name | Title |
| --- | --- |
| Most Reverend John M. LeVoir | Bishop<br>Board of Directors – president |
| Rev. Msgr. Eugene L. Lozinski | Chancellor<br>Board of Directors – secretary |
| Rev. Msgr. Douglas L. Grams | Vicar General<br>Board of Directors – member |
| Michael Boyle | Board of Directors – member |
| Steve Gehrke | Board of Directors – member |

Compensation of officers will be in accordance with pre-petition practices. Board members do not receive monetary compensation from the Diocese.

**VI.    MEANS OF EXECUTION.**

As further described in Article V of the Plan, the Plan will be funded by cash and other assets held by the Diocese's estate on the Effective Date, a contribution from the Parishes, and Settling Insurer contributions. The Diocese will pay all Allowed Claims, other than Survivor Claims and Unknown Survivor Claims, which will be paid through the Trust.

**VII.    TAX CONSEQUENCES OF THE PLAN.**

**THE INCOME TAX LAWS APPLICABLE TO RECEIVING A DISTRIBUTION OR DEDUCTING A LOSS FROM A BANKRUPTCY ESTATE ARE COMPLEX. THE SUMMARY DESCRIPTION OF TAX CONSEQUENCES BELOW IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT UNCERTAINTIES.**

**THE PLAN PROPONENTS NEITHER HAVE REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR HAVE OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN.**

**THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR ANY OTHER ENTITY OR PERSON. EACH HOLDER OF A CLAIM SHOULD CONSULT HIS, HER, OR ITS TAX PROFESSIONAL TO UNDERSTAND FULLY THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

The following discussion summarizes certain federal income tax consequences of the Plan to the Diocese and holders of general unsecured claims and interests. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change. This summary does not address the federal income tax consequences to holders of allowed administrative expense claims, priority claims, or secured claims, if any. This summary does not address foreign, state, or local income tax consequences, or any estate or gift tax consequences of the Plan, or the federal income tax consequences of the Plan to special classes of taxpayers. Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

### A. Federal Income Tax Consequences to Holders of Unsecured Claims.

In accordance with the Plan, all classes of holders of General Unsecured Claims, holders of Survivor Claims, and holders of Unknown Survivor Claims, will receive a distribution on the Claims. Any holder of a General Unsecured Claim, Survivor Claim, or Unknown Survivor Claim will realize a loss in an amount equal to the Claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of General Unsecured Claims, Survivor Claims, and Unknown Survivor Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a claim for interest or principal, (ii) the origin of the Claim, (iii) the type of consideration received in exchange for the Claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The Plan Proponents anticipate that distributions to Survivor Claimants will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Plan Proponents have not, however, fully analyzed such tax

issues and cannot (and do no hereby) make any assurances or representations regarding the anticipate tax treatment of Survivor Claims.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM, SURVIVOR CLAIM, OR UNKNOWN SURVIVOR CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF A GENERAL UNSECURED CLAIM AS A RESULT OF THE PLAN.**

B.      **Federal Income Tax Consequences to the Diocese.**

The Diocese is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Diocese's status as a non-profit corporation, the Diocese anticipates that the confirmation of the Plan will have no material federal income tax consequences on a cash basis for the Diocese.

C.      **Tax Consequences to the Trust.**

The Plan Trust may satisfy the requirements of a designated settlement fund under Section 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Plan Trust as a designated settlement fund or a qualified settlement fund.

**THE PLAN PROPONENTS EXPRESS NO OPINION REGARDING WHETHER THE PLAN TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. THE PLAN PROPONENTS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING WHETHER THE PLAN TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE PLAN TRUST AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.**

VIII.    **ALTERNATIVES TO THE PLAN.**

The Plan Proponents believe the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following two alternatives may be available: (A) an alternative plan of reorganization may be proposed and confirmed or (B) the Diocese's Chapter 11 Case may be dismissed. As discussed below, a third option, liquidation under Chapter 7, is not a viable alternative in this Chapter 11 Case.

A.      **Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code.**

If the Plan is not confirmed, the Plan Proponents, either jointly or separately, may propose a different plan, which might involve an alternative means for reorganization of the Diocese. However, the Plan Proponents believe that the terms of the Plan provide for the best result for the Diocese's Creditors. The negotiation and drafting required for a different plan would likely add substantially greater administrative expenses with no guarantee of a better result for the Diocese's Creditors. For these reasons, the Plan Proponents do not believe that alternative plans of reorganization are preferable alternatives to the Plan.

B.      **Dismissal of the Diocese's Chapter 11 Case.**

If the Plan is not confirmed, the Diocese or another party in interest may seek to dismiss the Chapter 11 Case. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Case. Dismissal of the Diocese's Chapter 11 Case would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Filing Date.

Upon the dismissal of the Diocese's Chapter 11 Case, the protection of the Bankruptcy Code would be lost, resulting in the expensive and time-consuming process of negotiation and protracted litigation between the Diocese and individual Survivors and the Diocese and its insurers. In addition to the expense and delay, the Plan Proponents believe that these actions would lead to an unfair distribution to Creditors, with the first Creditors to obtain and enforce a judgment against the Diocese depleting the Diocese's assets and resulting in insufficient assets to satisfy any further judgments. Therefore, the Plan Proponents believe that dismissal of the Diocese's Chapter 11 Case is not a preferable alternative to the Plan.

C.      **Chapter 7 Liquidation Not A Viable Alternative.**

Pursuant to 11 U.S.C. § 1112(c), if a debtor is "not a moneyed corporation," the debtor's Chapter 11 case cannot be converted to a Chapter 7 case without the debtor's consent. The Diocese, as a non-profit entity, may not be forced to convert its Chapter 11 Case to a Chapter 7 case. Thus, conversion to a Chapter 7 case is not a viable alternative to the Plan.

IX.    **ACCEPTANCE AND CONFIRMATION OF THE PLAN.**

A.      **General Confirmation Requirements.**

Section 1129(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "Confirmation Hearing"). In order for a plan to be confirmed at the Confirmation Hearing, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case.

Section 1129(a) of the Bankruptcy Code contains the requirements for confirmation of a plan. Among these requirements are that (1) a plan must be accepted by the requisite votes of

creditors except to the extent that the plan may be confirmed over a dissenting class pursuant to 11 U.S.C. § 1129(b); (2) a plan must be feasible, meaning that there is a reasonable probability that the debtor will be able to perform its obligations under the plan without further need of financial reorganization; (3) a plan must in the "best interests" of all creditors, meaning that creditors will receive at least as much under the plan as they would receive in a hypothetical liquidation case under Chapter 7 of the Bankruptcy Code; and (4) a plan must comply with the applicable provisions of Chapter 11 of the Bankruptcy Code.

The Plan Proponents believe that the Plan complies with all of these requirements, including the specific requirements further discussed below.

**B.      Best Interests Test.**

The "best interests of creditors" test requires that the Bankruptcy Court find either (1) that all members of each impaired class has accepted the Diocese's Plan or (2) that each holder of an Allowed Claim of each impaired class of Claims will receive or retain under the Plan, on account of the Claim, property of a value that is not less than the amount that the holder would receive or retain if the Diocese was hypothetically liquidated under Chapter 7 of the Bankruptcy Code, as of the Effective Date.

To calculate what holders of Claims would receive if the Diocese was hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from the hypothetical liquidation (the "Chapter 7 Liquidation Fund"). The Chapter 7 Liquidation Fund would consist of the net proceeds in the Diocese's hypothetical Chapter 7 case from the disposition of the Diocese's assets augmented by the cash held by the Diocese and recoveries on actions against third parties, if any.

The Chapter 7 Liquidation Fund would then be reduced by the costs of liquidation, including without limitation (1) the fees and expenses of a trustee, counsel for the trustee, and any other professionals for the trustee, (2) selling expenses, (3) unpaid expenses incurred by the Diocese in the Chapter 11 Case, such as fees for attorneys, financial advisors, and accountants, that would be allowed in a Chapter 7 proceeding, (4) interest expense on oversecured debt, if any, (5) and claims incurred by the Diocese during the pendency of the Chapter 11 Case. These costs of liquidation would be paid from the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund would be made available to the Survivors and holders of General Unsecured Claims. In addition, the conversion to Chapter 7 would establish a new bar date for the filing of claims in the Chapter 7 case and additional filed claims or claims that would other arise upon conversion to a Chapter 7 case would dilute the balance of the Chapter 7 Liquidation Fund available to Creditors. The present value of the distributions out of the Chapter 7 Liquidation after deduction of the amounts described above is then compared to the present value of the property offered to each of the classes of Claims under the Plan to determine if the Plan is in the best interests of each holder of a Claim.

The Plan Proponents believe that the Plan as proposed is in the best interest of all Creditors. While the Diocese may not be forced to convert to a Chapter 7 case, as further discussed in Section 8(B) of this Disclosure Statement, the Plan Proponents believe that Survivors and holders of General Unsecured Claims will receive a distribution under the Plan

greater than a distribution they would receive in a hypothetical Chapter 7 liquidation. In a Chapter 7 liquidation, the Settling Insurers would no longer be bound by the Insurance Settlement Agreements, resulting in $26 million no longer available for distribution. Similarly, a Chapter 7 liquidation would not benefit from the $1,000,000 in contributions from the Parishes. Moreover, the Chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest pursuant to 11 U.S.C. § 326, with the compensation necessarily diluting the amount of funds available to pay Creditors. Attached as **Exhibit A** is an analysis of expected recoveries to creditors under the Plan and under a hypothetical Chapter 7 liquidation of the Diocese.

While the liquidation analysis includes the liquidation of the Diocese's real and personal property, it is not clear if any of the Diocese's property would be capable of liquidation under Chapter 7 pursuant to the protections of the Religious Freedom Restoration Act, the First Amendment, and the Minnesota Constitution. The inclusion of this property in the liquidation analysis shall not be deemed an admission by the Diocese that the property is capable of liquidation.

Moreover, under the Plan, holders of Administrative Claims will be paid in full and the Plan Proponents believe holders of Administrative Claims will receive faster distribution under the Plan. In sum, for all of the reasons set forth above, the Plan Proponents anticipate that all Creditors will receive a larger and faster distribution under the Plan than under a Chapter 7 liquidation.

### C.      Financial Feasibility Test.

In addition to the requirements discussed above, the Bankruptcy Code requires that consummation of a plan will not likely be followed by the liquidation of, or the need for further financial reorganization of, the debtor. In this case, the Diocese has prepared projections of the cash flow for the ministries and operations of the Diocese. The cash flow projections are attached as **Exhibit B** to this Disclosure Statement. The cash flow projections demonstrate that the Diocese will be able to fund the Plan on the Effective Date and that the Reorganized Debtor will be able to make all payments required pursuant to the Plan. Accordingly, the Plan Proponents believe that the Plan passes the financial feasibility test.

### D.      Cramdown Alternative.

In the event that a certain class or classes of Claims reject the Plan, the Plan Proponents may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan at the request of the plan proponent if the plan "does not discriminate unfairly" and "is fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Plan Proponents believe that the Plan does not discriminate unfairly with respect to any classes of Claims.

31

In addition, a plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (ii) that the holder of any claim or interest that is junior to the claims of the class will not receive or retain on account of the junior claim or interest any property at all.

The Plan Proponents believe that the Plan meets the "fair and equitable" requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of Claims in all classes. Specifically with respect to holders of Survivor Claims, Unknown Survivor Claims, and General Unsecured Claims, the Plan does not provide for the retention of any interests by equity holders because the Diocese, as a non-profit entity, does not have any equity holders. Furthermore, the Plan provides the mechanism for capturing value from both real property owned by the Diocese and from coverage claims against the Settling Insurers, which will be assigned to the Trust, which will likely increase the distributions to holders of Survivor Claims and Unknown Survivor Claims. The Plan Proponents understand, however, that the Plan may not be confirmable with respect to these classes if any class does not vote in favor of the Plan.

## X.   RISK FACTORS TO BE CONSIDERED.

HOLDERS OF CLAIMS AGAINST THE DIOCESE SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.

### A.   Failure to Satisfy Vote Requirement.

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may be forced to pursue an alternative plan of reorganization or to dismiss the Chapter 11 Case.

### B.   Non-Confirmation or Delay of Confirmation of the Plan.

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

### C.   Non-Consensual Confirmation.

In the event any impaired class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Plan Proponents' request if the cramdown requirements, described in Section 9(D) of this Disclosure Statement, are met. The Plan Proponents believe that the Plan satisfies these requirements.

### D.      Risk of Non-Occurrence of the Effective Date.

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

### E.      Classification and Treatment of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Diocese. The Bankruptcy Code also provides that the Plan may place a Claim in a particular class only if the Claim is substantially similar to the other Claims in the class. The Plan Proponents believe all Claims have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Plan Proponents would be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that it has complied with the requirement of equal treatment. To the extent that the Court finds that the Plan does satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay of the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

### F.      Review of Class 1 And Class 2 Claims.

The potential recovery to Class 1 Survivor Claims and Class 2 Claims depends on, among other things, the outcome of the Survivor Claim Reviewer's review of the Class 1 and Class 2 Claims both in order to determine if the Claim will be allowed and in order to allocate the appropriate point allocation for each Claim for purposes of distribution. Therefore, the distribution to holders of Class 1 and Class 2 Claims will increase or decrease depending on the allowance of Claims and the point allocation give to each Claim.

## XI.      CONCLUSION.

The Plan offers the best alternative for the highest and fastest recovery for Creditors. Accordingly, the Plan Proponents believe that the Plan is in the best interests of the Diocese's Creditors and other interested parties, and the Diocese urges the holders of impaired Claims entitled to vote to accept the Plan and to evidence their acceptance by properly voting and timely returning their ballots.

[Signatures on following page.]

**THE DIOCESE OF NEW ULM**

*/e/ Rev. Msgr. Douglas L. Grams*
Rev. Msgr. Douglas L. Grams, Vicar General


*/e/ Steven R. Kinsella*
James L. Baillie (#0003980)
James C. Brand (#387362)
Steven R. Kinsella (#0392289)
Samuel M. Andre (#0399669)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
jbaillie@fredlaw.com
jbrand@fredlaw.com
skinsella@fredlaw.com
sandre@fredlaw.com

**ATTORNEYS FOR THE DIOCESE OF NEW ULM**

**AND**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

*/e/ Bruce Doney*
By: Bruce Doney
Its: Chairperson


*/e/ Robert T. Kugler*
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Brittany Michael (#397592)
**STINSON, LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
brittany.michael@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS FOR THE DIOCESE OF
NEW ULM**

**DISCLOSURE STATEMENT**
**EXHIBIT A**

**DIOCESE OF NEW ULM**

**Liquidation Analysis**

| | Plan of Reorganization | Hypothetical Liquidation |
|---|---|---|
| Cash | $ 7,730,000.00 | $ 5,168,579.24 |
| Real Property | $ - | $ 5,394,500.00 |
| Other Non-Cash Assets | $ - | $ 181,470.93 |
| Parish Contributions | $ 1,000,000.00 | $ - |
| Insurance Policy Settlements | $ 26,000,000.00 | $ - |
| **TOTAL** | **$ 34,730,000.00** | **$ 10,744,550.17** |
| | | |
| **Unsecured Creditors Waterfall** | | |
| | | |
| **Total Distributable Assets** | **$ 34,730,000.00** | **$ 10,744,550.17** |
| | | |
| **Less Administrative Claims** | | |
| Chapter 11 Administrative Expenses | $ (350,000.00) | $ (350,000.00) |
| Chapter 7 Trustee Fees | $ - | $ (356,086.51) |
| | | |
| **Unsecured Claim Distributions** | | |
| Known Survivor Claims | Pro Rata Share of $33,530,000 | |
| General Unsecured Claims | 100% of Claims | Pro Rata Share of $10,038,464 |
| Parish Claims | Disallowed | |
| Pre-Effective Date Unknown Survivor Claims | Share of $500,000 | |
| Post-Effective Date Unknown Survivor Claims | Share of $400,000 | $ - |
| Late-Filed Survivor Claims | Share of $40,000 | $ - |

**DISCLOSURE STATEMENT**
**EXHIBIT B**

**DIOCESE OF NEW ULM**

INCOME STATEMENT

| | Actual | Actual | | | | Projected | | | | | | | | Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY2019 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | FY2020 |
| Diocesan United Fund | 1,542,093 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 129,844 | 1,558,124 |
| Investment Income | 151,035 | 12,479 | 12,656 | 12,623 | 12,687 | 12,687 | 12,687 | 12,687 | 12,687 | 12,687 | 12,687 | 12,687 | 12,687 | 151,937 |
| Gifts & Bequests | 6,350 | 8,547 | 703,135 | 10,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 721,682 |
| Grants | 156,106 | 55,000 | 0 | 4,055 | 0 | 0 | 50,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 114,055 |
| Funds Applied | 1,142,843 | 30,815 | 118,634 | 14,286 | 121,861 | 0 | 186,307 | 0 | 0 | 304,307 | 0 | 0 | 186,307 | 962,517 |
| Diocesan Ministries Annual Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office Income | 177,620 | 5,761 | 6,776 | 25,054 | 8,785 | 12,980 | 12,980 | 12,980 | 12,980 | 12,980 | 12,980 | 12,980 | 12,980 | 150,219 |
| Realized/Unrealized Inv. Gains | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Miscellaneous Income | 44,622 | 3,493 | 3,393 | 3,393 | 3,793 | 3,393 | 3,393 | 3,393 | 3,393 | 3,393 | 3,393 | 3,393 | 3,393 | 41,220 |
| Lots Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **REVENUE, GAINS, & OTHER** | **3,220,669** | **245,939** | **974,438** | **199,254** | **276,969** | **158,904** | **395,211** | **163,904** | **158,904** | **463,211** | **158,904** | **158,904** | **345,211** | **3,699,753** |
| Administration | 1,007,930 | 98,570 | 95,216 | 81,926 | 98,433 | 83,952 | 83,952 | 83,952 | 83,952 | 91,021 | 91,009 | 90,997 | 90,985 | 1,073,962 |
| Evangelization & Catechesis | 497,790 | 70,091 | 39,911 | 59,382 | 46,809 | 41,758 | 41,758 | 41,758 | 41,758 | 41,758 | 41,758 | 41,758 | 41,758 | 550,254 |
| Worship & Spiritual Life | 85,128 | 7,449 | 5,618 | 5,750 | 5,029 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 85,349 |
| Social Ministries | 608,877 | 59,697 | 50,490 | 51,608 | 59,752 | 58,088 | 58,088 | 58,088 | 58,088 | 58,088 | 58,088 | 58,088 | 58,088 | 686,252 |
| Personnel | 538,039 | 36,893 | 22,951 | 32,618 | 166,421 | 27,319 | 27,319 | 27,319 | 27,319 | 152,319 | 27,319 | 27,319 | 27,319 | 602,432 |
| **OPERATING EXPENSE** | **2,737,764** | **272,699** | **214,187** | **231,283** | **376,443** | **218,804** | **218,804** | **218,804** | **218,804** | **350,873** | **225,861** | **225,849** | **225,837** | **2,998,249** |
| **NET INCOME FROM OPS** | **482,905** | **(26,760)** | **760,252** | **(32,028)** | **(99,474)** | **(59,900)** | **176,407** | **(54,900)** | **(59,900)** | **112,338** | **(66,957)** | **(66,946)** | **119,373** | **701,504** |
| Funds Applied Expense/(Income) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-Operating Expense/(Income) | (1,387,450) | 0 | 0 | 0 | 0 | 0 | (321,327) | 0 | 7,057,500 | (15,065) | 0 | 0 | 0 | 6,721,108 |
| Special Issues Expense/(Income) | 829,131 | 8,903 | 278 | 214,494 | 6,015 | 0 | 200,000 | 0 | 250,000 | 0 | 0 | 0 | 0 | 679,689 |
| **NON-OPERATING EXP/(INC)** | **(558,319)** | **8,903** | **278** | **214,494** | **6,015** | **0** | **(121,327)** | **0** | **7,307,500** | **(15,065)** | **0** | **0** | **0** | **7,400,797** |
| **CHANGE IN NET ASSETS** | **1,041,224** | **(35,662)** | **759,974** | **(246,523)** | **(105,489)** | **(59,900)** | **297,734** | **(54,900)** | **(7,367,400)** | **127,403** | **(66,957)** | **(66,946)** | **119,373** | **(6,699,294)** |

**DIOCESE OF NEW ULM**  BALANCE SHEET

| | | Actual | Actual | | | | Projected | | | | | | | | Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FY2019 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | FY2020 |
| 56 | Cash and Equivalents | 5,167,350 | 5,130,660 | 5,905,309 | 5,605,205 | 5,533,691 | 5,501,471 | 5,864,789 | 5,833,548 | 321,872 | 484,827 | 420,456 | 356,732 | 481,306 | 481,306 |
| 57 | Reserved Cash | 0 | | | | | | | | | | | | | 0 |
| 58 | Charitable Trust Cash | 9,805,332 | 9,936,169 | 9,744,466 | 9,822,843 | 9,840,716 | 9,831,216 | 9,635,409 | 9,625,909 | 9,616,409 | 9,302,602 | 9,293,102 | 9,283,602 | 9,087,795 | 9,087,795 |
| 59 | Accounts Receivables | 41,124 | 84,364 | 118,378 | 135,378 | 149,604 | 128,037 | 124,089 | 105,794 | 104,604 | 106,101 | 105,617 | 104,486 | 101,363 | 101,363 |
| 60 | Bequest Receivables | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 61 | Prepaid Expenses | 330,170 | 329,698 | 329,226 | 328,754 | 328,281 | 327,810 | 327,810 | 327,810 | 16,140 | 16,140 | 16,140 | 16,140 | 16,140 | 16,140 |
| 62 | **Total Current Assets** | **15,343,976** | **15,480,891** | **16,097,379** | **15,892,179** | **15,852,293** | **15,788,533** | **15,952,097** | **15,893,061** | **10,059,025** | **9,909,670** | **9,835,314** | **9,760,959** | **9,686,604** | **9,686,604** |
| 63 | | | | | | | | | | | | | | | |
| 64 | Land, Buildings, & Equipment | 7,048,003 | 7,048,003 | 7,048,003 | 7,048,774 | 7,048,774 | 7,048,774 | 6,954,939 | 6,954,939 | 6,954,939 | 6,851,855 | 6,851,855 | 6,851,855 | 6,851,855 | 6,851,855 |
| 65 | Accumulated Depreciation | (918,454) | (927,595) | (936,736) | (945,877) | (955,018) | (964,159) | (935,461) | (944,325) | (953,189) | (893,513) | (901,986) | (910,459) | (918,932) | (918,932) |
| 66 | **Total Fixed Assets** | **6,129,549** | **6,120,408** | **6,111,267** | **6,102,897** | **6,093,756** | **6,084,615** | **6,019,478** | **6,010,614** | **6,001,750** | **5,958,342** | **5,949,869** | **5,941,396** | **5,932,923** | **5,932,923** |
| 67 | | | | | | | | | | | | | | | |
| 68 | Restricted Investments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 69 | **Total Charitable Trust Funds** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| 70 | | | | | | | | | | | | | | | |
| 71 | Land Held For Resale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 72 | Equity in COLCC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 73 | **Total Other Assets** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| 74 | | | | | | | | | | | | | | | |
| 75 | **TOTAL ASSETS** | **21,473,524** | **21,601,299** | **22,208,646** | **21,995,076** | **21,946,048** | **21,873,148** | **21,971,575** | **21,903,675** | **16,060,775** | **15,868,011** | **15,785,183** | **15,702,355** | **15,619,526** | **15,619,526** |
| 76 | | | | | | | | | | | | | | | |
| 77 | Accounts Payable | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 78 | Reserves and Other | 194,556 | 194,892 | 194,802 | 194,733 | 194,930 | 194,930 | 194,930 | 194,930 | 32,430 | 32,430 | 32,430 | 32,430 | 32,430 | 32,430 |
| 79 | Custodian Funds | 527,714 | 635,619 | 677,627 | 639,432 | 691,175 | 678,175 | 665,175 | 652,175 | 639,175 | 626,175 | 613,175 | 600,175 | 587,175 | 587,175 |
| 80 | **Total Current Liabilities** | **722,271** | **830,511** | **872,429** | **834,165** | **886,104** | **873,104** | **860,104** | **847,104** | **671,604** | **658,604** | **645,604** | **632,604** | **619,604** | **619,604** |
| 81 | | | | | | | | | | | | | | | |
| 82 | Mortgage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,700,000 | 1,697,141 | 1,694,270 | 1,691,387 | 1,688,493 | 1,688,493 |
| 83 | **Total Long Term Liabilities** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **1,700,000** | **1,697,141** | **1,694,270** | **1,691,387** | **1,688,493** | **1,688,493** |
| 84 | | | | | | | | | | | | | | | |
| 85 | Unrestricted - Undesignated | 3,551,663 | 3,524,696 | 4,293,364 | 4,054,763 | 3,957,966 | 3,898,065 | 4,195,799 | 4,140,899 | (3,226,501) | (3,099,098) | (3,166,056) | (3,233,001) | (3,113,628) | (3,113,628) |
| 86 | Unrestricted - Designated | 376,534 | 376,980 | 377,427 | 377,875 | 378,324 | 378,324 | 378,324 | 378,324 | 378,324 | 378,324 | 378,324 | 378,324 | 378,324 | 378,324 |
| 87 | Unrestricted - Investments - Fixed Asse | 7,480,399 | 7,471,258 | 7,462,117 | 7,453,747 | 7,444,606 | 7,444,606 | 7,444,606 | 7,444,606 | 7,444,606 | 7,444,606 | 7,444,606 | 7,444,606 | 7,444,606 | 7,444,606 |
| 88 | Restricted | 9,342,658 | 9,397,854 | 9,203,309 | 9,274,526 | 9,279,049 | 9,279,049 | 9,092,742 | 9,092,742 | 9,092,742 | 8,788,435 | 8,788,435 | 8,788,435 | 8,602,128 | 8,602,128 |
| 89 | **TOTAL NET ASSETS** | **20,751,254** | **20,770,787** | **21,336,216** | **21,160,911** | **21,059,944** | **21,000,044** | **21,111,471** | **21,056,571** | **13,689,170** | **13,512,266** | **13,445,309** | **13,378,363** | **13,311,430** | **13,311,430** |
| 90 | | | | | | | | | | | | | | | |
| 91 | **TOTAL LIABILITIES & NET AS** | **21,473,524** | **21,601,299** | **22,208,646** | **21,995,076** | **21,946,048** | **21,873,148** | **21,971,575** | **21,903,675** | **16,060,775** | **15,868,011** | **15,785,183** | **15,702,355** | **15,619,526** | **15,619,526** |

**92 DIOCESE OF NEW ULM**  
CASH FLOW STATEMENT

| | Actual | Actual | | | | Projected | | | | | | | | Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 94 | FY2019 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | FY2020 |
| 95 **Operating Cash Flow** | | | | | | | | | | | | | | |
| 96 **(1) Net Income** | **1,041,224** | **(35,662)** | **759,974** | **(246,523)** | **(105,489)** | **(59,900)** | **297,734** | **(54,900)** | **(7,367,400)** | **127,403** | **(66,957)** | **(66,946)** | **119,373** | **(6,699,294)** |
| 97 Adjustments: | | | | | | | | | | | | | | |
| 98 Depreciation | 97,662 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | (28,698) | 8,864 | 8,864 | (59,676) | 8,473 | 8,473 | 8,473 | 478 |
| 99 Reserved Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 100 Accounts Receivable | (2,004) | (43,240) | (34,014) | (17,000) | (14,226) | 21,568 | 3,947 | 18,295 | 1,190 | (1,497) | 484 | 1,131 | 3,123 | (60,239) |
| 101 Bequest Receivables | 18,215 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 102 Prepaid Expenses | (306,003) | 472 | 472 | 472 | 472 | 471 | 0 | 0 | 311,670 | 0 | 0 | 0 | 0 | 314,030 |
| 103 Accounts Payable | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 104 Reserves and Other | (9,190) | 336 | (90) | (69) | 197 | 0 | 0 | 0 | (162,500) | 0 | 0 | 0 | 0 | (162,127) |
| 105 Custodian Funds | (203,051) | 107,904 | 42,008 | (38,195) | 51,742 | (13,000) | (13,000) | (13,000) | (13,000) | (13,000) | (13,000) | (13,000) | (13,000) | 59,460 |
| 106 **(2) Total Adjustments** | **(404,370)** | **74,614** | **17,518** | **(45,651)** | **47,326** | **18,180** | **(37,750)** | **14,159** | **146,224** | **(74,173)** | **(4,043)** | **(3,396)** | **(1,404)** | **151,603** |
| 107 **(3) Net Operating Cash Flow** | **636,854** | **38,951** | **777,492** | **(292,174)** | **(58,163)** | **(41,720)** | **259,983** | **(40,741)** | **(7,221,176)** | **53,229** | **(71,000)** | **(70,342)** | **117,969** | **(6,547,691)** |
| 108 | | | | | | | | | | | | | | |
| 109 **Investing Cash Flow** | | | | | | | | | | | | | | |
| 110 Net (Cap X)/Disposal of Fixed Assets | 102,030 | 0 | 0 | (771) | 0 | 0 | 93,835 | 0 | 0 | 103,084 | 0 | 0 | 0 | 196,148 |
| 111 Source/(Use) from Charitable Trusts | (59,028) | (130,837) | 191,703 | (78,377) | (17,873) | 9,500 | 195,807 | 9,500 | 9,500 | 313,807 | 9,500 | 9,500 | 195,807 | 717,537 |
| 112 Source/(Use) from Land Resale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 113 Source/(Use) from COLCC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 114 **(4) Net Investing Cash Flow** | **43,002** | **(130,837)** | **191,703** | **(79,148)** | **(17,873)** | **9,500** | **289,642** | **9,500** | **9,500** | **416,891** | **9,500** | **9,500** | **195,807** | **913,685** |
| 115 | | | | | | | | | | | | | | |
| 116 **Financing Cash Flow** | | | | | | | | | | | | | | |
| 117 Source/(Use) from Mortgage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,700,000 | (2,859) | (2,871) | (2,883) | (2,895) | 1,688,493 |
| 118 Change in Restricted Assets | 276,273 | 55,196 | (194,545) | 71,217 | 4,522 | (0) | (186,307) | 0 | 0 | (304,307) | 0 | (0) | (186,307) | (740,530) |
| 119 **(5) Net Financing Cash Flow** | **276,273** | **55,196** | **(194,545)** | **71,217** | **4,522** | **(0)** | **(186,307)** | **0** | **1,700,000** | **(307,166)** | **(2,871)** | **(2,883)** | **(189,202)** | **947,962** |
| 120 | | | | | | | | | | | | | | |
| 121 **(6) Net Cash Flow (Sum 3-5)** | **956,129** | **(36,690)** | **774,649** | **(300,104)** | **(71,514)** | **(32,220)** | **363,318** | **(31,241)** | **(5,511,676)** | **162,954** | **(64,371)** | **(63,724)** | **124,574** | **(4,686,044)** |
| 122 **(7) Beginning Operating Cash** | **4,211,220** | **5,167,350** | **5,130,660** | **5,905,309** | **5,605,205** | **5,533,691** | **5,501,471** | **5,864,789** | **5,833,548** | **321,872** | **484,827** | **420,456** | **356,732** | **5,167,350** |
| 123 **(8) Ending Operating Cash (6+7)** | **5,167,350** | **5,130,660** | **5,905,309** | **5,605,205** | **5,533,691** | **5,501,471** | **5,864,789** | **5,833,548** | **321,872** | **484,827** | **420,456** | **356,732** | **481,306** | **481,306** |